1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9

| | | |
|---|---|---|
| 10 | KENNETH A. ROBERTS,       ) | 1:08-cv-01093-AWI-JMD-HC |
| 11 |      Petitioner,    ) | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF |
| 12 |  v.      ) | HABEAS CORPUS |
| 13 | JAMES D. HARTLEY      ) | |
| 14 |      Respondent.    ) | OBJECTIONS DUE WITHIN THIRTY DAYS |
| 15 | | |

16      Petitioner Kenneth A. Roberts ("Petitioner") is a state prisoner proceeding *pro se* with a

17 petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

18                              **Procedural History**

19      On July 11, 1986, Petitioner pleaded *nolo contendre* to one count of second degree murder

20 (Cal. Pen. Code § 187) with use of a firearm (Cal. Pen. Code 12022.5).  (Pet. at 1).  The sentencing

21 court imposed a sentence of fifteen years to life in connection with Petitioner's murder conviction,

22 plus two years for the firearm enhancement, for a total sentence of seventeen years to life.  (Pet., Ex.

23 F).

24      Petitioner appeared before California's Board of Parole Hearings (BPH) on June 15, 2006.

25 The BPH denied Petitioner parole based solely on the nature of Petitioner's commitment offense.

26 (Answer, Ex. C, Part 2 at 30).[1]

27

28
―――――――――――――――

[1] Page citations for exhibits and pleadings contained on the Court's CM/ECF docket correspond to the PDF files' respective page numbers, not the page numbers contained on the original documents.

1    Petitioner challenged the BPH's 2006 denial of parole in a petition for writ of habeas corpus

2    filed with the Los Angeles County Superior Court on January 30, 2007.  (Answer, Ex. A).  The

3    Superior Court issued a reasoned decision denying Petitioner relief on August 21, 2007.  (Answer,

4    Ex. B).

5    Petitioner filed a second petition for writ of habeas corpus in the California Court of Appeal

6    on November 20, 2007.  (Answer, Ex. D).  The Court of Appeal summarily denied the petition on

7    November 29, 2007.[2]  (Id.).

8    Petitioner filed a third petition for writ of habeas corpus in the California Supreme Court.

9    The California Supreme Court summarily denied the petition on July 9, 2008.  (Answer, Ex. E).

10    Petitioner filed the instant federal petition for writ of habeas corpus on July 20, 2008.  (Doc.

11    1).  Respondent filed an answer to the petition on January 6, 2009.  (Doc. 12).  Petitioner filed a

12    traverse on February 4, 2009.  (Doc. 13).

13                                                **Factual Background**

14    The BPH relied "solely" on Petitioner's commitment offense to deny Petitioner parole.

15    (Answer, Ex. C, Part 2 at 30).  Because Petitioner pleaded *nolo contendre* to his commitment

16    offense, there are no judicial findings of fact regarding Petitioner's crime.  Accordingly, the BPH

17    relied on the description of Petitioner's crime contained in the probation officer's report, which

18    provides in pertinent part:

19        On August 3, 1984, at approximately 6:00 p.m., Roberts and his live-in girlfriend,
         Annette Lillian Thom, left their apartment residence and drove into the high dessert
20        area.  They went to an area known as Little Rock area which is approximately one and
         a half miles southwest of 9220 East Fort Tejon Road.  While at this location, Roberts
21        shot his girlfriend with a .22 caliber rifle.  Los Angeles County Sheriff's document
         (086-01713-1171-011) reveals that the post-mortem examination shows that the
22        victim died from a single gunshot wound to the head approximately two inches
         behind the ear.  After the defendant shot the victim, the defendant buried the victim in
23        a grave that was approximately three feet deep and five feet, ten inches long.  After
         the victim had completed his task at this location, he returned home to his residence at
24        approximately 3:00 a.m. the following day.

25

26    _____

      [2] The California Court of Appeal's decision consists of two sentences, followed by citation to *In re Rosekrantz*, 29 Cal.4th
27    616, 667 (2002) and *In re Dannenberg*, 34 Cal.4th 1061 (2005).  The Court of Appeal's decision does not contain sufficient
      analysis to permit review of that Court's reasoning.  *See Bailey v. Rae*, 339 F.3d 1107, 1112-1113 (9th Cir. 2003) (federal
28    habeas courts must look through ambiguous or unexplained State court decisions).  Justice Zelon dissented from the Court
      of Appeal's summary denial. (Answer, Ex. D).

During the following days the defendant gave to his brother, James Yuill, the victim's automobile, a 1977 red Triumph. Also the defendant and his son, Greg Roberts, removed the victim's personal belongings from the residence and threw them in a dumpster behind the apartment house.

On August 7, 1984, Genevieve Capone, a coworker of the victim reported to the Los Angeles Police Department that her friend Annette Thom was missing. Police did an investigation into the matter and defendant told the police that he and his girlfriend Annette Thom left the residence on the night of August 3, 1984 to look at the stars and lights of the city from a vantage point in the desert. On the way home from the location, the defendant stated to the police that they had an argument and that while the car was stopped Thom left Roberts on foot in an angry mood. The defendant also stated that she came back the following night to remove some of her clothing from their common residence. The police continued the missing persons investigation but did not reach a conclusion of the problem.

On February 3rd, 1986 persons were hunting in the Little Rock area. A dog they had with them apparently dug a hole and recovered what appeared to be a jawbone. The two hunters took the jawbone to another individual who inspected it and concluded it was a human jawbone and immediately contacted the local sheriff's department. The investigating officer was shown the depression which had been partially dug out and there were several bones scattered about the edge of the hole. The police officers saw that there appeared to be some clothes and a leg bone partially buried in the depression. [sic] Officer notified headquarters and requested a homicide coroner team be sent to that location. The following day an anthropologist dig team showed up and proceeded to remove the remains of the victim....

In the ensuing investigation it was determined that Mr. Yill and his brother had made public statements to the police regarding the victim's disappearance. When confronted with the new evidence, the Defendant's brother...stated that his brother had confided in him and had told him that he had killed Annette Thom and that he had shot her and buried her somewhere in the desert where no one could find her....After an exhaustive investigation the Los Angeles Sheriff's Department homicide team issued a teletype broadcast for the arrest of Ken Roberts. On April 8, 1986, the defendant and his attorney went to the Los Angeles County Jail to turn defendant in to the authorities.

(Answer, Ex. C, Part 1 at 68-72; Ex. C. Part 2 at 79-85 (Probation Report)).

In addition to reading the probation officer's description of Petitioner's crime into the record, the BPH read Petitioner's account of his crime into the record:

According to Roberts its [sic] commonplace to go to watch stars from a favorite location in Little Rock with the victim. He claimed that he and his girlfriend were having an argument and that his girlfriend was also having an argument with his son Greg. In order to alleviate the situation Roberts said that he invited his girlfriend to go watch the skies from their favorite desert location. Roberts said he did not drink alcoholic beverages of any kind, was not inebriated...the night of her death. [sic] States that he did buy the rifle prior to the night in question...for target shooting. According to Roberts it was during one of those arguments at the desert location that the accident occurred. He states that the rifle was sitting...in the [truck] bed tool box. She angrily knocked the rifle and the box onto the ground. He was leaning down trying to pick up the rifle and the box. The victim pushed him...Roberts became annoyed and with the rifle in his hand pushed her back. As this occurred the rifle

discharged hitting the victim in the head.  After the incident Roberts stated that he went into a stupor- that he knew he had to do something in order to cover this terrible tragedy.

(Answer, Ex. C, Part 1 at 72-73).

The BPH made several favorable findings regarding Petitioner's suitability for parole.  The BPH stated:

You're a hard working guy.  There's no question about that and you had a lot of skills.  Your institutional behavior has been remarkable.  One 128 the entire 20 years you've been- been down.  That's remarkable and we- we the people that work here appreciate good behavior like that because it makes their [sic] job easier.  You've programed well even though they couldn't do any better- Palmdale, L.A. went so far in 1996 while you were in Nevada to get your GED...Currently you're a line server.  You've worked in wood shop with very good...attitude according to the PIA folks.  You've worked as a barber, porter, tutor, records clerk.  You're programing- your vocations are very good.  Dental lab tech- certainly marketable skills- computer tech and drafting.

Most recently you were asked to continue to upgrade and you did.  Life Management and Anger, Coping Skills, the Victim Awareness group through the CLM.  The psychiatric reports is favorable done by S. Weir, Ph.D in Nevada...we don't have a date on it but we kind of read into it and it appears that it was January of '03 that it was done.  We're going to be ordering a new psych. for you and a California psych. for your next hearing.  The parole plans couldn't do any better- Palmdale, L.A. County...You've proved to us that ...you're qualified for SSI as well as you've also proved the pension plan will give you somewhere in the neighborhood of $20,000 a year.   You've got as I mentioned before...marketable skills.

(Answer, Ex. C, Part 2 at 28-30).

At the conclusion of Petitioner's 2006 parole suitability hearing, the BPH denied Petitioner parole.  The presiding parole commissioner articulated the basis for the parole denial as follows:

The Panel...relied on the following circumstances in concluding that the prisoner is not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison.  You are doing everything that you've been asked to do and you're doing it well.  But we're going to deny you for one year and in this denial we want you to continue to do what you've been doing.  We're denying you based on the crime in that it was especially cruel and callous- certainly carried out in a dispassionate calculated (indiscernible) strike calculated- certainly carried out in a dispassionate manner.  While you did not abuse the victim- and I want to make that clear- you did not abuse or defile or mutilate the victim's body- your actions created a situation that caused her body to be abused an mutilated after she was dead because she was buried in a desert and there's [sic] animals that- that find corpses.  That's how she was discovered- by a dog.

The motive for this crime and you pled guilty to second degree murder so that's what we- we're not here to retry the case.  The motive for the crime was inexplicable and it manages to stay inexplicable.  That- take a human life-its (indiscernible).  You had military service.  I assumed that involved weapons and when you have a weapon that's loaded they're always loaded and we treat them that they're always loaded and

getting into a physical altercation with a weapon can lead to as your military training probably reflects can lead to as you say it was an accident. You weren't...very responsible in the handling of this particular weapon that caused the death of another human being.

The age...you were about 45 at the time of the commitment offense but you're a man- you weren't under the influence...you were clear...

[A]gain we want to congratulate you on 20 years and two months without any discipline problems and you've done everything the Board has asked you to do so we're denying you for one year based solely on the crime and we would like to see a new psychiatric report from California next year.

(Answer, Ex. C, Part 2 at 26-30).

After rendering the parole denial, the presiding commissioner asked Petitioner if he had anything to say. Petitioner responded by asking "what [must I] do to make myself suitable at my next appearance?" (Id. at 30). The presiding commissioner gave the following response:

You continue to do what you're doing and make it tough on this Board to deny you. I think in-I think- we think you're being still a little trivial- trivializing- minimizing the way the crime went down and we're not totally- we're not- I'm not- I'm not accusing- we're not accusing you of taking her out there, shooting her in the back of the head. An argument was going on, the box- tool box and the gun, you picked that up- you're picking that up and there was a [sic] argument- a tussle going on there and it just doesn't sound quite right, number one. Number two, you asked the question- I'll give you the hard answers here- number two, we're not exactly buying the story that you were turning your self in. The timing on that was so close to the fact that a warrant had just been issued for you and it just so happened you turned yourself in at that point in time...

We think you were just hoping that she'd never have been found. That's what we're thinking. We can't prove it. I didn't elaborate on that when I talked about the crime cause I just talked about the crime. It's a terrible crime. Buried her out there and if-if is-if the truth is as stated right now I know that people say that if I change my story again then they'll give me more time to think about that. The truth will prevail, sir. The truth will set you free...we feel like you minimized the-this particular crime. We really do. So you've got to deal with that. There's some- I think there's some dark spots on your soul that you- that you might want to take a- take a look at.

(Id. at 31-32).

## Discussion

### I.      Jurisdiction and Venue

A person in custody pursuant to the judgment of a state court may file a petition for a writ of habeas corpus in the United States district courts if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); *Williams v. Taylor*, 529 U.S. 362, 375, n.7 (2000).

1  Venue for a habeas corpus petition is proper in the judicial district where the prisoner is held in

2  custody.  *See* 28 U.S.C. § 2241(d).

3      Petitioner asserts that he is currently incarcerated at Avenal State Prison in Avenal,

4  California, in violation of his right to due process under the United States Constitution.  As Avenal is

5  within the Eastern District of California, the Court has jurisdiction to entertain Petitioner's petition

6  and venue is proper in the Eastern District.  28 U.S.C. § 84; 28 U.S.C. § 2241(c)(3).

7  **II.     Standard of Review**

8      Section 2254 "is the exclusive vehicle for a habeas petition by a state prisoner in custody

9  pursuant to a state court judgment, even when the petitioner is not challenging his underlying state

10  court conviction."  *Sass v. California Board of Prison Terms*, 461 F.3d 1123, 1126 (9th Cir. 2006)

11  (quoting *White  v. Lambert*, 370 F.3d 1002, 1009-10 (9th Cir. 2004)).  Under section 2254, a petition

12  for writ of habeas corpus may not be granted unless the state court decision denying Petitioner's state

13  habeas petition "was contrary to, or involved an unreasonable application of, clearly established

14  Federal law, as determined by the Supreme Court of the United States," or  "was based on an

15  unreasonable determination of the facts in light of the evidence presented in the State court

16  proceeding." 28 U.S.C. § 2254(d).  "A federal habeas court may not issue the writ simply because

17  that court concludes in its independent judgment that the relevant state-court decision applied clearly

18  established federal law erroneously or incorrectly...rather, that application must be objectively

19  unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (citations omitted).   In reviewing a state

20  court's summary denial of a state habeas petition, the Court must "look through" the summary

21  disposition to the last reasoned decision issued by the state.  *Ylst v. Nunnemaker*, 501 U.S. 797, 806

22  (1991).  As the California Court of Appeal and the California Supreme Court both summarily denied

23  Petitioner's state habeas petitions, the Court must review the reasoned decision of the Los Angeles

24  Superior Court denying Petitioner relief.  The California Supreme Court is presumed to have rejected

25  Petitioner's state habeas petition for the same reasons set forth in the reasoned decision of the

26  Superior Court.  *Id.* at 803.

27  ///

28  ///

**III.     Petitioner's Due Process Claim**

      **A.  Due Process in the Parole Context**

The Due Process Clause of the Fourteenth Amendment of the United States Constitution prohibits states from depriving persons of protected liberty interests without due process of law. *See e.g.*, *Sass*, 461 F.3d at 1127.  The Court must "analyze Petitioner's due process claim in two steps: 'the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.'" *Id.* (quoting *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460 (1989) *partially overruled on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995)). California law vests prisoners whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date.  *See Irons v. Carey*, 505 F.3d 846, 850-51 (9th Cir. 2007); *Sass*, 461 F.3d at 1128; *McQuillion v. Duncan*, 306 F.3d 895, 903 (9th Cir. 2002) (citing *Greenholtz v. Inmates of Neb. Penal and Corr. Complex*, 442 U.S. 1, 12 (1979)); *Biggs v. Terhune*, 334 F.3d 910, 915 (2003).[3]  Accordingly, the Court must determine whether the State's denial of parole to Petitioner complied with the relevant constitutionally mandated procedural safeguards.

Although California's parole statute creates a liberty interest protected by the Due Process Clause, *Irons*, 306 F.3d at 903, "since the setting of a minimum term is not part of a criminal prosecution, the full panoply of rights due a defendant in [a criminal prosecution proceeding] is not constitutionally mandated" in the parole context, *Pedro v. Oregon Parole Bd.*, 825 F.3d 1396, 1399 (9th Cir. 1987).  In *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 12-13 (1979), the Supreme Court held that where the language of a state's parole statute creates a statutory

---

[3] Respondent's argument that California's parole statute does not create protected liberty interest because "California' parole statute does not contain mandatory language" is frivolous.  (Answer at 3). California Penal Code section 3041 provides, in relevant part, "One year prior to the inmate's minimum eligible parole release date a panel of two or more commissioners or deputy commissioners **shall** again meet with the inmate and **shall normally set a parole release** date as provided in Section 3041.5." (emphasis added). The California Supreme Court has repeatedly acknowledged that the language of section 3041 is mandatory.  *E.g. In re Lawrence*, 44 Cal.4th 1181, 1204 (Cal. 2008) ("The governing statute provides that the Board *must* grant parole *unless* it determines that public safety requires a lengthier period of incarceration") (emphasis in original).  Under the law of the Ninth Circuit, it is settled that California's parole statute creates a constitutionally protected liberty interest in a parole release date.  *E.g.*, *Irons*, 505 F.3d at 851.

expectancy of release, due process requires that a prisoner be 1) afforded an opportunity to be heard; and 2) informed of the reasons for a parole denial. *Id*. at 15.  Six years after deciding *Greenholtz*, in *Superintendent, Mass. Correctional Institution v. Hill*, 472 U.S. 445, 455 (1986), the Supreme Court held that a prison disciplinary board's decision to revoke a prisoner's good time credits must be supported by "some evidence."  In *Hill*, the Supreme Court noted that "[i]n a variety of contexts, the Court has recognized that a governmental decision resulting in the loss of an important liberty interest violates due process if the decision is not supported by any evidence." *Id*.  Because the fundamental purpose of the "some evidence" standard is to prevent arbitrary deprivations of liberty, *see id.,* and because the liberty interest implicated by parole decisions in California is analogous to the liberty interest implicated in *Hill*– i.e., release from prison– the Ninth Circuit has repeatedly held that the "some evidence" standard applies to California parole determinations, *Irons*, 505 F.3d at 851 (citing *Sass*, 461 F.3d at 1128-29 (quoting *Superintendent v. Hill*, 472 U.S. 445, 457(1985)); *Biggs*, 334 F.3d at 915; *McQuillion*, 306 F.3d at 904.  The Ninth Circuit has also concluded that the "some evidence" standard is clearly established federal law for the purpose of AEDPA review.[4]  *Irons*, 505 F.3d at 851 (citing *Sass*, 461 F.3d at 1128-29 (quoting *Superintendent v. Hill*, 472 U.S. 445, 457(1985)); *see also Biggs*, 334 F.3d at 915; *McQuillion*, 306 F.3d at 904.

Respondent disputes the Ninth Circuit's holding that the some evidence standard applies to Petitioner's claim, citing  *Wright v. Van Patten*, 128 S.Ct. 743, 746-47 (2008); *Schriro v. Landrigan*, 127 S.Ct. 1933 (2007); *Musladin*, 127 S.Ct. 649, 652-54 (2006); *Foote v. Del Papa*, 492 F.3d 1026, 1029 (9th Cir. 2007);  *Nguyen v. Garcia*, 477 F.3d 716, 718, 727 (9th Cir. 2007); and *Crater v. Galaza*, 491 F.3d 1119, 1122 (9th Cir. 2007) for the proposition that "a test announced in one context is not clearly established federal law when applied to another context."  (Answer at 5-6).  Respondent's authority is unpersuasive.  Unlike the narrow, particularized rules discussed in Respondent's authority, the "some evidence" test provides a baseline standard applicable "[i]n a

---

[4] The Ninth Circuit is currently considering the "some evidence" standard en banc. *Hayward v. Marshall*, 512 F.3d 536, (9th Cir. 2008) *reh'g en banc granted*, 527 F.3d 797 (2008).

variety of contexts."[5]  *See Hill*, 472 U.S. at 455.  The Supreme Court routinely applies the some evidence standard to a diverse array of due process questions.  *Compare Hill ,* 472 U.S. at 455-56 (prison disciplinary hearing) *with Schware v. Board of Bar Examiners*, 353 U.S. 232, 239 (1957) (denial of admission to bar); *United States ex rel. Vajtauer v. Commissioner of Immigration*, 273 U.S. 103, 106 (1927) (deportation); and *Douglas v. Buder*, 412 U.S. 430, 432 (1973) (revocation of probation).

"The Supreme Court need not have addressed the identical factual circumstances at issue in a case in order for it to have created 'clearly established' law governing that case...rather, it is enough that the Supreme Court has prescribed a rule that plainly governs the petitioner's claim." *McQuillion v. Duncan*, 306 F.3d at 901.  The some evidence standard plainly governs Petitioner's claim, as any lesser standard would permit arbitrary deprivations of Petitioner's liberty interest in parole.  As the Ninth Circuit explained in *Sass*:

> [The] some evidence standard is minimal, and assures that "the record is not so devoid of evidence that the findings of the disciplinary board were without support or otherwise arbitrary." *Hill*, 472 U.S. at 457. Hill held that although this standard might be insufficient in other circumstances, "[t]he fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact." *Id.* at 456. To hold that less than the some evidence standard is required would violate clearly established federal law because it would mean that a state could interfere with a liberty interest -- that in parole -- without support or in an otherwise arbitrary manner. We therefore reject the state's contention that the some evidence standard is not clearly established in the parole context.

461 F.3d at 1129.  The Court agrees with and is bound by the Ninth Circuit's conclusion that the some evidence standard applies to Petitioner's claim.  *E.g. id.*

**B. The Some Evidence Standard and California Parole Law**

In assessing whether the Board's denial of parole to Petitioner is supported by some evidence, the Court's analysis "is framed by the statutes and regulations governing parole suitability

---

[5] For example, in *Van Patten,* the Supreme Court held that the presumption of prejudice applicable to certain types of ineffective assistance of counsel claims was not clearly established federal law for AEDPA purposes as applied to a petitioner's claim that his counsel was ineffective for participating at petitioner's plea hearing via speaker-phone. 552 U.S. at 121 (discussing *United States v. Cronic*, 466 U.S. 648 (1984)).  The presumption espoused in *Cronic* is a narrow exception reserved for "constitutional error of the first magnitude." 466 U.S. at 658 n.26.  Unlike the generally applicable some evidence standard, by its own terms, the *Cronic* presumption only applies in rare circumstances where it appears that counsel's conduct resulted in a complete breakdown of the adversarial process. *Id.*

1   determinations in the relevant state." *Irons*, 505 F.3d at 851.  Accordingly, the Court must "look to

2   California law to determine the findings that are necessary to deem a prisoner unsuitable for parole,

3   and then must review the record in order to determine whether the state court decision holding that

4   these findings were supported by 'some evidence' in [Petitioner's] case constituted an unreasonable

5   application of the 'some evidence' principle articulated in *Hill*." *Id.*  "Ascertaining whether [the

6   some evidence] standard is satisfied does not require...weighing of the evidence. ..the relevant

7   question is whether there is any evidence in the record that could support the conclusion reached."

8   *Hill*, 472 U.S. at 455-456

9        Under California law, the paramount inquiry in determining whether to grant a prisoner

10   parole is whether the prisoner "will pose an unreasonable risk of danger to society if released from

11   prison." CAL. CODE. REGS. TIT 15, § 2402(a) (2009); *Lawrence*, 44 Cal.4th at 1202.  Title 15, section

12   2402 of the California Code of Regulations sets forth the factors to be considered by the BPH in

13   applying California's parole statute to Petitioner.  Section 2402 provides in part:

> All relevant, reliable information available to the panel shall be considered in
> determining suitability for parole. Such information shall include the circumstances of
> the prisoner's social history; past and present mental state; past criminal history,
> including involvement in other criminal misconduct which is reliably documented;
> the base and other commitment offenses, including behavior before, during, and after
> the crime; past and present attitude toward the crime; any conditions of treatment or
> control, including the use of special conditions under which the prisoner may safely
> be released to the community; and any other information which bears on the prisoner's
> suitability for release. Circumstances which taken alone may not firmly establish
> unsuitability for parole may contribute to a pattern which results in a finding of
> unsuitability.

CAL. CODE. REGS., tit. 15, § 2402(b).  The fact that a prisoner's commitment offense was carried out

in an "especially heinous, atrocious or cruel manner" may establish unsuitability for parole.  CAL.

CODE REGS., tit. 15, § 2402(c).

       Section 2402(c) directs the BPH to consider whether a crime was carried out in an especially

heinous, atrocious, or cruel matter with reference to the following criteria: (A) multiple victims were

attacked; (B) the offense was carried out in a dispassionate and calculated manner, such as an

execution style murder; (C) the victim was abused, defiled or mutilated during or after the offense;

(D) the offense was carried out in a manner which demonstrates an exceptionally callous disregard

1    for human suffering; and (E) the motive for the crime is inexplicable or very trivial in relation to the

2    offense.  *Id.*  Where evidence suggests that one or more of the factors discussed in section 2402(c)

3    apply to the circumstances of a prisoner's crime, such evidence "establish[es] unsuitability [for

4    parole] if, and only if, [the circumstances of the crime] are probative to the determination that a

5    prisoner remains a danger to the public." *Lawrence*, 44 Cal.4th at 1212.   "When a court reviews a

6    decision of the Board or the Governor, the relevant inquiry is whether some evidence supports the

7    decision ...that the inmate constitutes a current threat to public safety...not merely whether some

8    evidence confirms the existence of certain factual findings."  *Id.*  A rational nexus between the

9    unsuitability factors discussed in section 2402(c) and the ultimate determination of dangerousness

10   must exist in order for a prisoner's commitment offense to provide a legitimate basis for a parole

11   denial.  *See id.* at 1227.

12       **C. The Superior Court's Decision**

13       The last reasoned decision provided by the State is the decision of the Los Angeles Superior

14   Court denying Petitioner relief.  The Superior Court's conclusion that the BPH's decision to deny

15   Petitioner parole was supported by "some evidence" was based on 1) the BPH's purported finding

16   that the offense was carried out in a dispassionate and calculated manner; 2) the BPH's purported

17   finding that the motive for Petitioner's crime was very trivial in relation to the offense; and 3) the

18   BPH's purported finding that Petitioner defiled the victim after the offense.  (Answer, Ex. B).

19           **1. "The Offense Was Carried Out in a Dispassionate and Calculated Manner**"

20       The Superior Court held that some evidence in the record supported the BPH's finding that

21   the offense was carried out in a dispassionate and calculated manner.  (Id.)  The Superior Court

22   reasoned:

23           The Court finds that there is some evidence to support the Board's finding that the
            offense was carried out in a dispassionate and calculated manner.  Even if the
24          shooting of the victim was unplanned, as Petitioner contends, his actions thereafter
            were deliberate, self-protective, and calculated.  Petitioner, with forethought, buried
25          the victim, gave her car away, and disposed of her personal items.  He repeatedly lied
            to the police for a year and a half and did not admit the crime until the victim's body
26          was found and his brother told police about Petitioner's conduct.

27   (Answer, Ex. B).

28   ///

1    At the outset, the Court notes that the Superior Court's order misstates the BPH's actual

2  finding.  The BPH *did not* conclude that Petitioner carried out the offense in a calculated manner.  To

3  the contrary, the presiding commissioner stated: "we're denying you based on the crime in that it was

4  especially cruel and callous- certainly carried out in a dispassionate calculated (indiscernible) **strike**

5  **calculated**- certainly carried out in a dispassionate manner."  (Answer, Ex. C, Part 2 at 26)

6  (emphasis added).  As the BPH concluded that the evidence on the record did not support a finding

7  that Petitioner carried out his crime in a calculated manner, it was inappropriate for the Superior

8  Court to assert a contrary interpretation of the evidence.  *See In re Roderick*, 154 Cal.App.4th 242,

9  265 (Cal. Ct. App. 2007) ("Given the extraordinarily deferential standard of review we already apply

10  to the Board's decisions, it would be inappropriate for courts to salvage the Board's inadequate

11  findings by inferring factors that might have been relied upon").

12    No evidence in the record supports the Superior Court's finding that Petitioner murdered the

13  victim in a calculated or dispassionate fashion.  Unlike many of the cases in which California courts

14  have upheld findings under section 2402(c)(1)(B), the record in this case provides no evidence that

15  Petitioner planned his commitment offense in advance or otherwise carried out the crime in a

16  dispassionate manner.  *See Rosenkrantz*, 29 Cal.4th at 678 (finding some evidence that crime was

17  committed in a calculated and dispassionate manner where prisoner "brutally murdered" his victim

18  after "a full week of careful preparation, rehearsal and execution"); *In re Rico*, 171 Cal.App.4th 659,

19  682 (Cal. Ct. App. 2009) (holding some evidence supported finding where trial testimony suggested

20  premeditation); *In re Barker*, 151 Cal.App.4th 346, 372 (Cal. Ct. App. 2007) (because prisoner

21  planned his crime, "the murders could be said to be 'dispassionate and calculated'"); *In re*

22  *Bettencourt*, 156 Cal.App.4th 780, 800 (Cal. Ct. App. 2007) (finding some evidence of dispassion

23  where prisoner's co-offender stabbed victim with a screwdriver and then a kitchen knife while

24  prisoner held victim down).[6]

25

26  [6] In *Bettencourt*, the Court found that the crime was committed in calculated and dispassionate manner because evidence in the record demonstrated that while Bettencourt was beating the victim, his crime partner determined that the screwdriver

27  being used to stab the victim was an ineffective stabbing weapon and "purposefully replaced the screwdriver with a kitchen knife in order to kill the victim." 156 Cal.App.4th at 800. In the same paragraph, the court discussed Bettencourt's attempts

28  to conceal his crime: "Bettencourt and his crime partner then attempted to conceal the murder by cleaning up the victim's apartment while his body lay nearby, wrapping the body ...and taking the body to a location where they could dump it over

1    Simply possessing a gun at the time of the crime and shooting a victim does not constitute

2    "some evidence" that a murder was carried out in a calculated and dispassionate manner within the

3    meaning of section 2402(c)(1)(B).  *See In re Gray*, 151 Cal.App.4th 379, 405 (Cal. Ct. App. 2007)

4    ("in a number of cases, the courts rejected the conclusions of the Governor and the Board that having

5    a gun and committing a murder shows that the crime was cold and calculating and thus especially

6    heinous under the regulation"); *accord In re Weider*, 145 Cal.App.4th 570, 587-88 (Cal. Ct. App.

7    2006) (where there was no evidence that prisoner conducted himself dispassionately, the fact that he

8    took a loaded weapon into a bar and shot the victim held insufficient to constitute some evidence to

9    support BPH's finding that the crime as dispassionate and calculated); *In re Scott*, 119 Cal.App.4th

10   871, 878, 889-90 (Cal. Ct. App. 2004) (insufficient evidence on record to support board's finding

11   that crime was calculated where prisoner went to the home of his wife's lover with a loaded gun,

12   pointed the weapon at the lover, saying "I'm going to shoot you," and firing two or three rounds); *In*

13   *re Burdan*, 169 Cal.App.4th 18, 24-25 (Cal. Ct. App. 2008) **(**rejecting Governor's finding that

14   murder was calculated despite evidence on the record showing that prisoner "purchased ammunition,

15   borrowed a handgun under false pretenses, arranged to meet his wife, and shot her five times at close

16   range while being required to cock the gun before each shot").   As the evidence at issue in *Wieder*,

17   *Scott*, and *Burdan* was held insufficient to constitute some evidence of calculation and dispassion, *a*

18   *fortiori*, the description of Petitioner's crime contained in the probation report falls far short of

19   providing some evidence that Petitioner committed his crime in the manner described by section

20   2402(c)(1)(B).  Other than the probation report, the only evidence on the record describing the

21   manner in which the offense was committed is Petitioner's testimony, according to which he

22   accidentally shot the victim during a heated argument that had escalated into a physical tussle.

23   (Answer, Ex. C, Part 1 at 72-73).

24   ///

25   _____

26   a cliff. *These facts also provide some evidence that the body was defiled (by being dumped over a cliff) and mutilated (by multiple stab wounds.*" *Id.*(emphasis added). The Court does not read *Bettencourt* as standing for the proposition that the

27   prisoner's act of disposing of the victim's body was some evidence of dispassion and calculation; rather, it appears that court's discussion of the prisoner's post-crime conduct was included to establish that, in addition to meeting the criteria

28   discussed in section 2402(c)(1)(B) the victim's body had been defiled and mutilated within the meaning of section 2402(c)(1)(C).

1    Thus, neither Petitioner's nor the probation report's account of the crime supports the Superior

2    Court's conclusion that the murder was carried out in a calculated and dispassionate manner.

3           The evidence cited by the Superior Court to support its finding that Petitioner murdered the

4    victim in a calculated and dispassionate manner does not support the Superior Court's conclusion.  In

5    the Superior Court's view, Petitioner's attempts to conceal his crime "were deliberate, self-

6    protective, and calculated," thus rendering the murder calculated and dispassionate.[7] (Answer, Ex.

7    B).  Assuming *arguendo* that the record supports an inference that Petitioner acted in a calculated

8    and dispassionate manner while covering up his crime, the fact that Petitioner calculated some of his

9    actions related to the crime does not establish that the *murder* was carried out in the manner

10   described by section 2402(c)(1)(B).   *See In re Elkins*, 144 Cal. App.4th 475, 497 (Cal. Ct. App.

11   2006) (holding that although evidence established that prisoner acted in a calculated fashion by going

12   to victim's home with a plan to rob the victim, evidence of calculation did extend to the murder,

13   which occurred spontaneously during the robbery).  While Petitioner's post-crime conduct may be

14   relevant to his parole suitability determination, *see* CAL. CODE. REGS., tit. 15, § 2402(b) (BPH may

15   consider prisoner's conduct after the crime), it does not support the conclusion that the murder was

16   carried out in such an especially heinous, atrocious, or cruel manner so as to constitute a basis for

17   denying Petitioner parole, *see Elkins*, 144 Cal. App.4th at 498 (post-crime conduct held insufficient

18   to render crime so especially heinous or cruel that crime remained probative of dangerousness).  As

19   neither the probation report nor Petitioner's testimony provide evidence that Petitioner's murder was

20   carried out in a dispassionate and calculated manner, the Superior Court's holding reflects an

21   unreasonable determination of fact.

22   ///

23   _____

24   [7] The Superior Court's interpretation of the evidence in this regard is questionable, if not objectively unreasonable.  Petitioner buried the victim in a shallow three-foot-deep grave, gave the victim's car to his own brother, and disposed of the victim's

25   personal effects in a dumpster behind the residence he shared with the victim, a location likely to be one of the first places searched in connection with a diligent investigation by authorities.  Petitioner's feeble attempts to conceal his crime hardly

26   evince forethought, much less calculation.  To the contrary, Petitioner stated that he was in a "stupor" while attempting to cover up his crime (Answer, Ex. C, Part 1 at 73), and the BPH apparently credited his statement, as the presiding

27   commissioner was careful to point out that the BPH did not consider Petitioner's crime to have been carried out in a calculated manner. (Answer, Ex. C, Part 2 at 26; 31).   Nevertheless, even accepting the Superior Court's dubious

28   interpretation of the evidence, the fact that Petitioner acted in a calculated manner after the killing is insufficient to constitute some evidence of dangerousness given the record before the BPH.

### 2. "The Motive was Very Trivial in Relation to the Offense"

The Superior Court held that some evidence in the record established that the motive for Petitioner's crime was "very trivial in relation to the offense." The Superior Court stated:

> The Court also finds that there is some evidence to support the Board's finding that the Petitioner's motive was very trivial in relation to the offense. Although the victim was arguing with, and according to Petitioner, shoving him, she was not posing a threat to Petitioner's life or safety. Petitioner could have walked away from the victim at any time. The argument was a trivial motive for shooting the victim in the head and burying her in the desert.

(Answer, Ex. B at 3) (citation omitted). The Superior Court's order misstates the BPH's finding. The BPH did not find that Petitioner's motive was trivial, rather, the BPH stated that Petitioner's motive was "inexplicable." The word "trivial" does not appear in the BPH's discussion of the motive for Petitioner's crime. The BPH stated:

> The motive for this crime and you pled guilty to second degree murder so that's what we- we're not here to retry the case. The motive for the crime was inexplicable and it manages to stay inexplicable. That- take a human life-its (indiscernible).

(Answer, Ex. C, Part 2 at 27). As used in section 2402(c)(1)(E), the terms "trivial" and "inexplicable" describe distinct concepts. *See In re Barker*, 151 Cal.App.4th 346, 374 (Cal. Ct. App. 2007) (addressing each concept separately). "An 'inexplicable' motive...is one that is unexplained or unintelligible, as where the commitment offense does not appear to be related to the conduct of the victim[s] and has no other discernible purpose." *Barker*, 151 Cal.App.4th at 374. A motive is "trivial" within the meaning of section 2402(c)(1)(E) if it is "materially less significant (or more 'trivial') than those which conventionally drive people to commit the offense in question."[8] *In re Scott*, 119 Cal.App.4th 871, 893 (Cal. Ct. App. 2004); *Barker*, 151 Cal.App.4th at 374.

The Superior Court's finding that Petitioner's motive was trivial within the meaning of section 2402(c)(1)(E) is not supported by the record. The Superior Court based its finding on the

---

[8] In *Lawrence*, the California Supreme Court held that "the determination whether an inmate poses a current danger is not dependent upon whether his or her commitment offense is more or less egregious than other, similar crimes." 44 Cal.4th at 1221 (emphasis added). *Lawrence* does not stand for the proposition that comparative analysis is inappropriate in determining whether a crime is particularly egregious. Rather, *Lawrence* establishes simply that it is improper to base the ultimate finding of dangerousness solely on comparative analysis of a prisoner's crime. *See Id*. at 1217 (comparative analysis is not "a proper method of assessing whether 'some evidence' supports the...conclusion that a particular inmate represents an unreasonable threat to public safety.").

fact that the victim was not "posing a threat to Petitioner's life or safety [and] Petitioner could have walked away from the victim at any time." (Answer, Ex. B at 3).  However, whether a prisoner "could have avoided his or her commitment offense is not one of the section 2402, subdivision (c)(1) factors to be considered by the Board in determining whether the offense was committed in an 'especially heinous, atrocious or cruel manner.'" *Roderick*, 154 Cal.App.4th at 266-67.  The fact that Petitioner could have chosen not to commit his crime "does not rationally support a finding that a crime was committed in an especially heinous, atrocious or cruel manner." *Id*.  "To state that a defendant 'could have just left' or 'could have just gone home' says nothing more than the defendant could have chosen not to...mortally wound his victim; these facts do not describe the manner in which the murder was committed." *Id*.

As the probation report is silent regarding the motive for Petitioner's crime, the only evidence on the record regarding Petitioner's motive is Petitioner's testimony, according to which he and his girlfriend were fighting over a family dispute involving Petitioner's son.  (Answer, Ex. C, Part 1 at 72-73).  The fight escalated to a physical confrontation.  (Id.).  Although a domestic dispute does not justify murder, the mere fact that motive for Petitioner's crime was an unacceptable reason to kill a human being does not render the motive for his offense "trivial" within the meaning of section 2402(c)(1)(E).  *See In re Singler*, 169 Cal.App.4th 1227, 1244 (Cal. Ct. App. 2009).  As the California Court of Appeal opined in *Scott*:

> Given the high value our society places upon life, there is no motive for unlawfully taking the life of another human being that could not reasonably be deemed "trivial." The Legislature has foreclosed that approach, however, by declaring that murderers with life sentences must "normally" be given release dates when they approach their minimum eligible parole dates. (Pen. Code, § 3041, subd. (a).) The governing statute also states that the Board shall set a release date "unless it determines that the gravity of current convicted offense or offenses, or the timing and gravity of the current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." (Pen. Code, § 3041, subd. (b).) This language means a "more lengthy period of incarceration" is called for where the gravity of the offense or offenses of the prisoner in question is more indicative of a danger to the public if the prisoner is released than would ordinarily be the case. The reference in Board regulations to motives that are "very trivial in relationship to the offense" therefore requires comparisons; to fit the regulatory description, the motive must be materially less significant (or more "trivial") than those which conventionally drive people to commit the offense in question, and therefore more indicative of a risk of danger to society if the prisoner is released than is ordinarily presented.

1   119 Cal.App.4th at 893.

2       The evidence cited by the Superior Court is not relevant to the issue of whether the motive

3   for Petitioner's crime was "very trivial in relation to the offense." *Roderick*, 154 Cal.App.4th at 266-

4   67.  Further, as neither the probation report nor Petitioner's testimony provide evidence that

5   Petitioner's motive was "very trivial" within the meaning of section 2402(c)(1)(E), the Superior

6   Court's finding reflects an unreasonable determination of fact.

7                    **3. "The Victim was Defiled After the Offense"**

8       The Superior Court held that some evidence suggested that the victim was defiled after the

9   offense within the meaning of section 2402(c)(1)(C):

10          Additionally, the Court finds that there is some evidence that the victim was defiled
            after the offense.  The victim was buried and left to decompose in a shallow grave.
11          Her remains were later discovered by a dog.

12  (Answer, Ex. B at 3).  The BPH did not find that Petitioner abused, defiled, or mutilated the victim's

13  body.  The BPH stated:

14          While you did not abuse the victim- and I want to make that clear- you did no abuse
            or defile or mutilate the victim's body- your actions created a situation that caused her
15          body to be abused an mutilated after she was dead because she was buried in a desert
            and there's [sic] animals that- that find corpses.  That's how she was discovered- by a
16          dog.

17  (Answer, Ex. C, Part 2 at 27).  Under California law, disposing of a body in a rural area where the

18  body might be found by animals is "not equivalent to abusing, defiling, or mutilating the body during

19  or after the offense." *Singler*, 169 Cal.App.4th at 1243-44 (citing *In re Elkins*, 144 Cal.App.4th at

20  498 for the proposition that "continued reliance on the fact that [the prisoner] dumped the body down

21  a steep grade at Donner Pass did not amount to 'some evidence' supporting the denial of parole")).

22  Accordingly, the Superior Court's finding that Petitioner defiled the victim's body within the

23  meaning of section 2402(c)(1)(C) reflects an unreasonable determination of fact.

24      None of the three factors relied upon by the Superior Court to support the proposition that

25  Petitioner's crime was carried out in an especially heinous, atrocious or cruel manner are supported

26  by the record.  Accordingly, the Court must conclude that the Superior Court's order denying

27  Petitioner relief reflects an unreasonable determination of the facts in light of the evidence presented

28  in the State court proceeding.  The conclusion that the Superior Court's decision reflects an

1   unreasonable determination of facts does not end the Court's inquiry, however.   Petitioner is not

2   entitled to habeas corpus relief if the BPH's decision to deny Petitioner parole is supported by some

3   evidence that Petitioner posed an unreasonable risk of danger to society at the time of his 2006

4   parole suitability hearing.

5          **D.  The BPH's Decision to Deny Petitioner Parole**

6          The BPH relied "solely" on Petitioner's commitment offense in determining that Petitioner

7   would pose an unreasonable risk of danger to society if released.  (Answer, Ex. C, Part 2 at 30).

8   Under California law, a prisoner may be denied parole solely on the basis of the commitment offense

9   where the nature of the commitment offense bares a rational nexus to the prisoner's current

10  dangerousness.  *Lawrence,* 44 Cal.4th at 1221.  Absent a rational nexus to present dangerousness,

11  however, the mere presence of "some evidence" in the record to support the existence of a parole

12  unsuitability factor does not provide a basis for the BPH to deny parole.  *Id.*

13         **1. The BPH's Finding that Petitioner Acted in a Dispassionate Manner**

14         The BPH held that Petitioner carried out the murder in a dispassionate manner.  The only

15  evidence in the record concerning the manner in which Petitioner carried out his crime consists of

16  the description of the murder contained in the probation report and Petitioner's own testimony.

17  Neither the probation report nor Petitioner's testimony supports the BPH's finding of dispassion.

18  According to the probation report:

19         On August 3, 1984, at approximately 6:00 p.m., Roberts and his live-in
           girlfriend...left their apartment and drove to the high dessert area.  They went to an
20         area known as Little Rock area.  At this location, Roberts shot his girlfriend with a .22
           caliber rifle.  The Los Angeles County Sheriff's document revealed that the post-
21         mortem examination showed that the victim died from a single gunshot wound to the
           head approximately two inches behind the ear.
22

23  (Answer, Ex. C, Part 2 at 79-82 (Probation Report)).  The probation report's scant description of the

24  manner in which Petitioner killed the victim is insufficient to support the BPH's finding that

    Petitioner acted in a dispassionate manner.  *See Gray*, 151 Cal.App.4th at 405 (mere evidence that
25
    prisoner had a weapon and shot victim insufficient to support finding under section 2402(c)(1)(B));
26
    *compare Weider*, 145 Cal.App.4th at 587-88 (rejecting BPH's finding where there was no evidence
27
    that prisoner conducted himself dispassionately during the murder) *with In re Lowe*, 130 Cal.App.4th
28

1405 (upholding Governor's finding that prisoner acted "with cold, calculated dispassion" where evidence established that prisoner fired five shots into victim's head and chest while victim slept in bed).  Nor does Petitioner's testimony regarding his crime support the BPH's finding of dispassion. According to Petitioner, he and the victim had been fighting over family issues when the victim pushed him.  (Answer, Ex. C, Part 1 at 72-73).  In the ensuing tussle, Petitioner accidentally discharged a rifle he was holding, striking the victim in the head.  Although the BPH expressed some doubt as to Petitioner's version of the crime, it is clear that the BPH accepted, at a minimum, Petitioner's testimony that he and the victim had been arguing. The BPH stated:

> we're not accusing you of taking her out there, shooting her in the back of the head. An argument was going on, the box- tool box and the gun, you picked that up- you're picking that up and there was a [sic] argument- a tussle going on there and it just doesn't sound quite right.

(Answer, Ex. C, Part 2 at 31-32).  The BPH also appears to have credited Petitioner's statement that he and the victim were engaged in physical tussle at the time of the shooting:

> getting into a physical altercation with a weapon can lead to as your military training probably reflects can lead to as you say it was an accident.  You weren't...very responsible in the handling of this particular weapon that caused the death of another human being.

(Id. at 30).  Accordingly, neither the probation report nor Petitioner's testimony supports the BPH's finding that Petitioner carried out his crime in a dispassionate manner.  *A fortiori*, the evidence concerning the manner in which Petitioner committed his crime is insufficient to constitute some evidence that Petitioner posed an unreasonable risk of dangerousness at the time of his 2006 parole hearing.  This is especially so in light of the fact that the most recent psychological evaluation available to the BPH at the time of the 2006 hearing concluded that "there is no evidence that Kenneth Roberts would be of any danger to the health and welfare of the community should he be released."  (Answer, Ex. C, Part 2 at 68 (2003 Life Prisoner Evaluation Report)).

**2.  The BPH's Finding that Petitioner's Motive was "Inexplicable"**

Initially, the Court notes that the parole hearing transcript concerning the BPH's finding that Petitioner's motive was "inexplicable" is virtually unintelligible. The explanation given for the BPH's finding regarding Petitioner's motive consists of an incomplete sentence that was not transcribed by the reporter and three more sentences discussing an issue unrelated to Petitioner's

motive:

> The motive for this crime and you pled guilty to second degree murder so that's what we- we're not here to retry the case. The motive for the crime was inexplicable and it manages to stay inexplicable. *That- take a human life-its (indiscernible)*. You had military service. I assumed that involved weapons and when you have a weapon that's loaded they're always loaded and we treat them that they're always loaded and getting into a physical altercation with a weapon can lead to as your military training probably reflects can lead to as you say it was an accident. You weren't...very responsible in the handling of this particular weapon that caused the death of another human being.

(CITE) (emphasis added). The BPH's discussion of the irresponsible manner in which Petitioner handled the murder weapon does not describe Petitioner's motive. Under California law, a "motive" is defined as a "[c]ause or reason that moves the will and induces the action...[a]n inducement, or that which leads or tempts the mind to indulge a criminal act." *E.g., People v. Scheer*, 68 Cal.App.4th 1009, 1017 (Cal. Ct. App. 1998).

The only relevant evidence contained in the record of Petitioner's motive is Petitioner's testimony, according to which the motive for his crime was the anger and stress caused by a domestic dispute that had escalated into a physical altercation. The motive articulated by Petitioner is not "unexplained or unintelligible, as where the commitment offense does not appear to be related to the conduct of the victim and has no other discernible purpose." *Barker*, 151 Cal.App.4th at 374. Thus, the only evidence on the record concerning Petitioner's motive is completely contrary to the BPH's finding that the motive for Petitioner's offense was "inexplicable" within the meaning of section 2402(c)(1)(E). Accordingly, the BPH's finding that the "motive" for Petitioner's crime – negligent or reckless handling of a firearm – constituted "some evidence" that Petitioner remained a danger to society at the time of his 2006 parole hearing demonstrates precisely the type of arbitrary reasoning prohibited by the Due Process Clause where a protected liberty interest is at stake.

### 3. The Victim was Defiled After the Offense

Although the BPH stated expressly that Petitioner did not defile or mutilate the victim's body, it noted that Petitioner's actions "created a situation that caused her body to be abused and mutilated after she was dead because she was buried in a desert and there's animals that-that find corpses." (Answer, Ex. C, Part 2 at 26-27). The BPH's discussion of the fact that the victim's body was found by a dog appears to have been an attempt by the BPH to characterize Petitioner's crime as

especially heinous, atrocious, or cruel on the basis of section 2402(c)(1)(C), which permits the BPH

to consider whether "the victim was abused, defiled, or mutilated during or after the offense."

The BPH's statement suggests that Petitioner negligently– or perhaps recklessly– disposed of the

victim's body in a manner that was likely to result in the body being abused or mutilated by wild

animals.

Whether section 2402(c)(1)(C) applies to unintentional mutilation by animals resulting from

a killer's negligent or reckless disposal of a corpse is extremely doubtful.  Section 2402 is directed at

ascertaining a prisoner's risk of dangerousness, and it is axiomatic that unforseen mutilation caused

by an animal that occurs after the commission of a crime has little, if any, bearing on the risk of

danger posed by the prisoner.  Section 2402(c)(1)(C) appears to be directed at intentional mutilation

cause by the perpetrator of a crime, not unanticipated mutilation resulting from natural forces.

*Compare In re Van Houten*, 116 Cal.App.4th 339, 351 (Cal. Ct. App. 2004) (sustaining finding of

mutilation–and current dangerousness– where prisoner bound victim with lamp cord and subjected

her to "gratuitous mutilation" in the form of multiple stab wounds, including wounds inflicted with a

bayonet to the torso, knife through the neck, and carving fork to the stomach) *with Singler,* 169

Cal.App.4th at 1244 (holding that prisoner's disposal of corpse in rural area was not equivalent to

mutilation and rejecting Governor's finding of dangerousness).  Even assuming that, in some

instances, a killer's negligent or reckless disposal of a body implicates section 2402(c)(1)(C), the

record does not support the BPH's determination that Petitioner's disposal of the victim's body

constituted some evidence of Petitioner's dangerousness.

Petitioner's disposal of the victim's body in a rural area did not constitute defiling or

mutilating the victim's body within the meaning of section 2402(c)(1)(C).  *Singler*, 169 Cal.App.4th

at 1243-44.  In *Singler*, the Governor reversed a grant of parole to a prisoner on the basis that the

prisoner "dumped his wife's body in a rural area, 'defiling her in the process' which 'was akin to

dumping garbage in the wild to be ravaged by animals.'" 169 Cal.App.4th at 1233.  The California

Court of Appeal rejected the Governor's finding, holding that disposal of the victim's body in a rural

area "was not equivalent to abusing, defiling, or mutilating the body during or after the offense." *Id*.

(citing *Elkins*, 144 Cal.App.4th at 498 (no discussion of section 2402(c)(1)(C) where prisoner threw

victim's body down a steep mountain gorge and body was discovered approximately one year later "partially eaten by animals and strewn about the gorge.")).  Here, unlike in *Singler* and *Elkins*, Petitioner buried the victim and did not simply leave the body exposed in the wild to be ravaged by animals.  In light of *Singler* and *Elkins*, the BPH's finding that Petitioner "caused" the victim's body to be abused and mutilated lacks sufficient support in the record; this is especially so given the fact that the victim's body was not "abused" by the dog that discovered it until over a year after Petitioner committed the murder.

Even accepting the BPH's characterization that Petitioner "caused" the victim's body to be abused, the fact that Petitioner buried the victim's corpse in a grave susceptible to discovery by a dog does not render his crime so especially heinous, atrocious, or cruel that the crime remains probative of current dangerousness twenty-two years after its commission.  In order to provide a sufficient basis on which to deny parole, there must be a rational nexus between the mutilation of the victim's body and Petitioner's risk of dangerousness at the time of the 2006 parole hearing.  There is no rational nexus between Petitioner's act of burying the victim's body in a rural area and Petitioner's risk of dangerousness.  Similarly, there is no rational nexus between the fact that a dog discovered the victim's body and Petitioner's risk of dangerousness.

No evidence supports the BPH's conclusion that Petitioner carried out his crime in a dispassionate manner.  No evidence supports the BPH's conclusion that the motive for Petitioner's crime was inexplicable.  No rational nexus exists between the abuse of the victim's body referenced by the BPH and Petitioner's dangerousness.[9]  Accordingly, the BPH's denial of parole to Petitioner was arbitrary and thus violated Petitioner's due process rights.  Petitioner is entitled to relief.

## **RECOMMENDATION**

Based on the reasons stated above, the Court RECOMMENDS that:

1.      Petitioner's application for a writ of habeas corpus be GRANTED; and

2.      Judgment be entered granting a writ of habeas corpus as follows: The Board shall find

---

[9] The Court recognizes that factors "which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability," CAL. CODE. REG. tit 15 § 2402(b), however, even taken together, the factors relied on by the BPH to deny Petitioner parole do not amount to some evidence that Petitioner posed on unreasonable risk of danger to the community at the time of his 2006 parole hearing.

Petitioner suitable for parole at a hearing to be held within 30 days of the order adopting this decision, unless new evidence of his conduct in prison or change in mental status subsequent to Petitioner's 2006 parole consideration hearing is introduced that is sufficient to support a finding that Petitioner currently poses an unreasonable risk of danger to society if released on parole; and in the absence of any such new evidence showing Petitioner's unsuitability for parole, the Board shall calculate a prison term and release date for petitioner in accordance with California law.  Further, if the release date already has passed, Respondent shall, within ten (10) days of the Board's hearing, release Petitioner from custody.  With respect to his presumptive period of parole, Petitioner is to be credited for any time that has lapsed since the release date calculated by the Board or when a finding of suitability at Petitioner's 2006 parole consideration hearing would have become final pursuant to California Penal Code sections 3041(b) and 3041.2(a)), whichever is later.

This Findings and Recommendation is submitted to the Honorable Anthony W. Ishii, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(c). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:   January 25, 2010                   /s/ John M. Dixon**
UNITED STATES MAGISTRATE JUDGE